KYLE SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax

Attorneys for Plaintiff
Stacey A. Francis

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON – EUGENE DIVISION

| | |
|---|---|
| Stacey A. Francis,<br><br>Plaintiff,<br><br>v.<br><br>Experian Information Solutions, Inc.; and DOES 1 through 100 inclusive,<br><br>Defendants. | CASE NO. 6:23-cv-773<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **STACEY A. FRANCIS** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant Experian Information Solutions, Inc. ("Experian") is reporting two of Plaintiff's Capital One Auto Finance ("Capital One") accounts as multiple tradelines.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United

States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetuate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiff alleges she had two Capital One accounts. One opened on March 3, 2017 and one opened on January 8, 2019.

15. Despite the fact there were only two Capital One accounts, Experian is reporting

each account twice, totaling in four separate tradelines.

16. Experian's reporting is misleading as it appears that Plaintiff had four Capital One accounts; two of the tradelines are reporting as discharged in bankruptcy and two of the tradelines are reporting as past due.

17. Plaintiff alleges that it is patently incorrect and misleading for a single account to report as two tradelines.

18. Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

19. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

20. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

21. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

22. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

23. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

24. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

25. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

26. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

27. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

28. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

29. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

30. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

31. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

32. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

33. Each of the five (5) factors is weighted differently by FICO.

34. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

35. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

36. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

37. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

38. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

39. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

40. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.  e-OSCAR**

41. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

42. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

43. The ACDV contains codes next to certain data fields associated with a credit file.

44. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

45. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

46. For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

C. **Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

47. When a consumer files bankruptcy, certain credit reporting industry standards exist.

48. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

49. The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

50. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

51. The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

52. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

53. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

54. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

55. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

56. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

57. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

58. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

59. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the

correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

D.  **Plaintiff's Credit Report Contains Inaccurate and Adverse Tradelines, which Plaintiff Disputed to no Avail**

60. On November 1, 2022, Plaintiff ordered an Experian credit report to ensure proper reporting by Plaintiff's creditors (the "November 1 Credit Report").

61. Plaintiff noticed an adverse tradeline in her November 1 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

62. Plaintiff then disputed the inaccurate tradeline regarding the Capital One account opened March 3, 2017 via certified mail to Experian on or about November 10, 2022 (the "First Dispute Letter").

63. Plaintiff's First Dispute Letter specifically put Experian on notice that Plaintiff had filed for bankruptcy and received her discharged and the account should not be reported as past due.

64. Plaintiff is informed and believes that Experian received Plaintiff's First Dispute Letter and, in response, failed to send Plaintiff's dispute to Capital One, as the data furnisher, via an ACDV through e-OSCAR.

65. On January 18, 2023, Plaintiff ordered a second Experian credit report to ensure proper reporting by Plaintiff's creditors (the "January 18 Credit Report").

66. Plaintiff noticed adverse tradelines in her January 18 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

67. Plaintiff then disputed the inaccurate tradelines regarding the Capital One accounts via certified mail to Experian on or about February 2, 2023 (the "Second Dispute Letter").

68. Plaintiff's Second Dispute Letter specifically put Experian on notice that Plaintiff had two Capital One accounts and that each of the Capital One accounts should be reporting individually as a single tradeline and that the duplicate reporting should be removed.

69. Plaintiff's First Dispute Letter and Second Dispute Letter will collectively be referred to as the "Dispute Letters".

70. Plaintiff Dispute Letters requested the reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

71. Plaintiff is informed and believes that Experian received Plaintiff's Second Dispute

Letter and, in response, failed to send Plaintiff's disputes to Capital One, as the data furnisher, via an ACDV through e-OSCAR.

72. On March 29, 2023, Plaintiff ordered a third Experian credit report to determine if her accounts were updated.

   a. **Inaccuracy – Capital One**

73. Despite actual knowledge, Experian continued to report Plaintiff's single Capital One account, beginning in in 620313xxxxxxxxxx, as two separate accounts, one tradeline is reporting as discharged in bankruptcy and one tradeline is reporting as open and past due. This is patently incorrect as this was a single account that was discharged in bankruptcy.

74. Despite actual knowledge, Experian continued to report Plaintiff's single Capital One account, beginning in in 620734xxxxxxxxxx, as two separate accounts, one tradeline is reporting as discharged in bankruptcy and one tradeline is reporting as closed. This is patently incorrect as this was a single account.

75. Plaintiff alleges that Experian did not investigate whether Plaintiff only had two accounts.

76. Plaintiff alleges that Experian did not investigate whether Plaintiff's single account were each being reported twice.

77. Experian failed to provide notice to Capital One that Plaintiff was disputing the inaccurate and misleading information, and thus it failed to conduct a reasonable investigation of the information as required by the FCRA.

78. Based on Plaintiff's disputes, Experian should have known that Plaintiff only had two accounts with Capital One and that they were discharged in bankruptcy.

79. The most basic investigation would reveal that for each Capital One account, Experian was reporting two nearly identical tradelines on Plaintiff's report, and that this reporting fails to comply with the maximum possible accuracy and completeness standard of the FCRA.

80. Plaintiff alleges that Experian did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

81. If Experian reviewed such standards, Experian would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete. Further, Experian should have removed the duplicate tradelines being reported as Plaintiff only had two Capital One

accounts.

82. By continuing to report a single account as two accounts, it appears to third parties viewing Plaintiff's credit reports that Plaintiff had twice as many Capital One accounts discharged in bankruptcy as there actually were.

83. Experian is duplicating the reporting which magnifies the derogatory impact on Plaintiff's creditworthiness.

84. The lack of investigation and reporting of inaccurate and incomplete information by Experian is unreasonable.

**E. Damages**

85. Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

86. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

87. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Experian. Further, Plaintiff's diminished creditworthiness, resulting from Experian's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

88. Experian's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

89. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Experian Failed to Assure Credit Reporting Accuracy**

90. Experian violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

91. Had Experian maintained reasonable procedures to assure maximum accuracy, it

would have never reported the Capital One accounts as described herein.

92. Experian knew, or should have known, that there were two Capital One accounts, and therefore, there should not be four tradelines reporting. Further, Experian knew, or should have known, that these inaccurate and incomplete tradelines do not reflect *maximum possible accuracy and completeness* as required by the FCRA.

93. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Experian allowed.

94. As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

95. Experian's violations, as described herein, were willful; specifically, Experian has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

96. Experian regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Experian regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

97. To the extent Experian does send consumer disputes, Experian sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

98. Experian's employees receive little to no training concerning how to accurately report consumer debt.

99. Instead, Experian's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

100. Experian's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to

each dispute received.

101. Experian has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

102. As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

103. Experian's violations were willful, rendering Experian liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

104. In the alternative, Experian was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

105. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. §1681i(a)(1))
## (Against Defendants and Does 1-100)

106. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Experian Failed to Reinvestigate Following Plaintiff's Dispute**

107. Pursuant to 15 U.S.C. § 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Capital One accounts.

108. Thus, Experian failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

109. Experian is not a passive entity bound to report whatever information a data furnisher provides.

110. Plaintiff alleges Experian is readily familiar with the FCRA requirements and credit reporting industry standards.

111. Based on the foregoing, Plaintiff alleges that Experian can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

112. Experian can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

113. Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Capital One accounts correctly.

114. Had Experian conducted a proper investigation, it could have determined there were only two Capital One accounts each reporting as two tradelines and then removed the duplicate tradelines. However, Experian continued to report the Capital One accounts as four separate tradelines.

115. Experian, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

116. Further, Plaintiff alleges that on three separate occasions Experian failed to send an ACDV to Capital One to confirm accurate reporting on its accounts. Despite receiving the Dispute Letters providing notice of the inaccuracies, Experian did not delete or correct the tradelines or conduct an investigation.

117. The failures by Experian to investigate were each a separate violation of the FCRA.

118. In the alternative, if Experian deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), Experian failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from Experian, Plaintiff alleges Experian deemed his Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it failed to comply.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

119. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Experian Failed to Review and Consider all Relevant Information**

120. Experian violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

121. Experian's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

122.   Experian's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

123.   In the alternative, Experian was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

124.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
### (Against Defendants and Does 1-100)

125.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Experian Failed to Delete Disputed and Inaccurate Information**

126.   Experian violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

127.   Experian's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

128.   Experian's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

129.   In the alternative, Experian was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

130.   Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

131.   WHEREFORE, Plaintiff prays for judgment as follows:

a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: May 26, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

Dated: May 26, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher